ROBERT E. FREITAS (SBN 80948)
rfreitas@fawlaw.com
JOSHUA L. YOUNG (SBN 294055)
jyoung@fawlaw.com
FREITAS & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California  94065
Telephone:     (650) 593-6300
Facsimile:     (650) 593-6301

Attorneys for Defendant
GEA, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALESFORCE.COM, INC.,<br><br>               Plaintiff,<br><br>   v.<br><br>GEA, INC.,<br><br>               Defendant. | No.  4:19-cv-01710-JST<br><br>**GEA, INC.'S AMENDED ANSWER AND COUNTERCLAIM**<br><br>**DEMAND FOR JURY TRIAL** |

Defendant GEA, Inc. ("GEA") responds to salesforce.com, Inc.'s ("Salesforce")
Complaint (ECF 1) as follows:

1.      GEA acknowledges the allegations of the complaint. GEA lacks knowledge or
information sufficient to form a belief as to the truth of the allegations of paragraph 1.

2.      GEA admits the allegations of paragraph 2.

3.      GEA admits the allegations of paragraph 3.

4.      GEA admits the allegations of paragraph 4.

5.      GEA admits the allegations of paragraph 5.

6.      GEA denies the allegations of paragraph 6.

7.      GEA denies the allegations of paragraph 7.

8.      GEA denies the allegations of paragraph 8.

9.      GEA lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9.

10.     GEA denies the allegations of paragraph 10.

11.     GEA lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11.

12.     GEA admits that it entered an agreement with Salesforce in 2014. Except as expressly so admitted, GEA denies the allegations of paragraph 12.

13.     GEA denies the allegations of paragraph 13.

14.     GEA denies the allegations of paragraph 14.

15.     GEA admits that Case No. 16 CVS 019851 is pending, and that Salesforce is not a party to Case No. 16 CVS 019851. Except as expressly so admitted, GEA denies the allegations of paragraph 15.

16.     GEA realleges and incorporates by reference the answers to paragraphs 1-15.

17.     GEA admits that its former attorney, William E. Hopkins, sent a letter to Salesforce dated September 20, 2018. Except as expressly so admitted, GEA denies the allegations of paragraph 17.

18.     GEA denies the allegations of paragraph 18.

19.     GEA denies the allegations of paragraph 19.

20.     GEA denies the allegations of paragraph 20.

21.     GEA acknowledges the allegations of the complaint. GEA lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 21.

22.     GEA realleges and incorporates by reference the answers to paragraphs 1-21.

23.     GEA admits the allegations of paragraph 23.

24.     GEA denies the allegations of paragraph 24.

25.     GEA denies the allegations of paragraph 25.

26.     GEA acknowledges the allegations of the complaint. GEA denies the allegations of paragraph 26.

**COUNTERCLAIM**

1.     Pursuant to Federal Rule of Civil Procedure 13, GEA complains of Salesforce as follows.

2.     GEA is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Charlotte, North Carolina.

3.     Salesforce is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

**JURISDICTION**

4.     This court has subject matter jurisdiction over GEA's counterclaim and this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     GEA is the owner of valuable intellectual property that has been licensed to and has played an important role in the business of Grand Estates Auction Company, one of the premier luxury residential auction companies in North America. Over the past two decades, Grand Estates Auction Company has auctioned more than 700 properties located in destination areas such as Vail and Aspen, Colorado, Nantucket, Massachusetts, Naples, Florida, and the U.S. Virgin Islands. Success of the luxury residential auction business is heavily dependent on non-public information about prospective buyers and sellers of luxury properties. Acquiring this information requires a great deal of time, effort, and capital, and the development of personal connections. The proprietary information GEA has amassed and organized is extensive and uniquely valuable. GEA's database tracks more than 40 different data points related to past and future buyers, sellers, and business opportunities, including prospective buyer identities, contact information, personal price points, and purchasing habits and history.

6.     Salesforce operates a customer relationship management platform that allows customers to manage their sales, service, marketing, and commerce functions. In 2014, GEA created a Salesforce account to house its proprietary database. When it created its Salesforce account, GEA submitted an order form that required GEA to assent to Salesforce's Master Subscription Agreement ("MSA"), an adhesion contract. Salesforce's MSA is a form agreement

1    prepared by Salesforce and presented to prospective customers on a take or leave it basis. The

2    Salesforce MSA is comprised materially of non-negotiable terms dictated by Salesforce. GEA

3    renewed its account on July 6, 2016. The proposal prepared by Salesforce and presented to GEA

4    on July 6, 2016 provided that the contract between GEA and Salesforce would be effective when

5    accepted by GEA. A contract between GEA and Salesforce was formed when Leslie Farkas

6    accepted Salesforce's July 6, 2016 proposal on behalf of GEA on July 6, 2016 in Charlotte, North

7    Carolina.

8         7.      By 2016, in response to industry interest, GEA began to consider offering licenses

9    to its proprietary database. In August 2016, GEA granted its first non-exclusive license ("LAMI

10   License") to Luxury Auctions Marketing, Inc. ("LAMI"), a company controlled by Jeremy

11   LeClair. As a result of the license, LeClair obtained access to GEA's Salesforce database.

12        8.      Shortly after receiving access to GEA's database, LeClair stole GEA's database. In

13   September 2016, LeClair directed an employee, Kyle Whelan, to ask GEA's Salesforce sales

14   representative, Andrew Hotchkiss, to change the billing name on GEA's account from Leslie

15   Farkas to Jeremy LeClair. Whelan had no authority to request this change. Salesforce alleges in

16   paragraph 10 of its complaint in this case that "[t]rust is one of the core values at Salesforce,

17   where nothing is more important than the trusted relationship between Salesforce and its

18   customers, employees, partners, and everyone in the Salesforce family," but Salesforce betrayed

19   the trust GEA had placed in it, and began a series of acts by which it knowingly aided and abetted

20   LeClair's unlawful actions, actively participated in LeClair's theft of GEA's database, and,

21   through its independent actions, caused harm to GEA beyond that caused by LeClair.

22        9.      Without requiring any documentation establishing that Whelan had the right to

23   change the billing name or otherwise remove Mr. Farkas from the account, and without seeking

24   confirmation from Mr. Farkas that Whelan had authority to make the request he made, and in

25   disregard of its regular procedure for verifying ownership changes, Salesforce made the change

26   requested by Whelan. Enabled by Salesforce, LeClair deleted the Salesforce access credentials for

27   Mr. Farkas and Valeria DeVine, GEA's Chief Executive Officer, with the result that GEA was

28   locked out of its own account, and unable to access the database that was essential to its ability to

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
NO. 4:19-CV-01710-JST

1    do business.

2          10.      Salesforce admits in its complaint that LeClair, Whelan, and LAMI never provided

3    proof of ownership of the GEA database or the GEA Salesforce account. Salesforce was aware at

4    all relevant times that LeClair, Whelan, and LAMI had not provided proof of ownership. Despite

5    its awareness that no proof of ownership had been provided, Salesforce knowingly enabled

6    LeClair, Whelan, and LAMI to lock GEA out of the GEA database and the GEA Salesforce

7    account.

8          11.      When GEA discovered it could no longer access the account, GEA notified

9    LeClair that LAMI had breached the LAMI License and demanded that access be restored to

10   GEA. When he became aware of GEA's demand, LeClair directed Whelan to instruct Salesforce

11   to notify him immediately if anyone from GEA attempted to contact Salesforce regarding the

12   database.

13         12.      On October 13, 2016, Ms. DeVine emailed Salesforce to demand that Salesforce

14   immediately reinstate GEA's access to its database. Salesforce knew, and any reasonable person

15   or company in the position of Salesforce would have known, that GEA was the owner of the

16   database, and LAMI was no more than a licensee. The account had been opened by GEA, and

17   Ms. DeVine attached GEA's license agreement with LAMI to her email to Salesforce. The

18   license proved that GEA owned the database and the Salesforce account that had been

19   misappropriated by LeClair with the assistance of Salesforce.

20         13.      Salesforce falsely alleges in its complaint that GEA never provided proof of its

21   ownership of the GEA database or the GEA Salesforce account. In October 2016, however,

22   Salesforce admitted in writing that GEA was the owner of the database and the account, and

23   promised that it would prevent anyone from making changes to the account.

24         14.      Salesforce acknowledged that GEA owned the database and the Salesforce account

25   it had opened in a written response to Ms. DeVine's October 13, 2016 email. Salesforce

26   employee Alonso Barrantes responded to Ms. DeVine's email later that day, and acknowledged

27   that the LAMI License proved GEA owned the account. Mr. Barrantes advised Ms. DeVine that

28   the LAMI License "clarifies enough for us, I will attach the [LAMI License] so we will have the

1   proof that you own this business and the account and prevent anyone to make any changes to it."

2   Despite Mr. Barrantes' acknowledgement and commitment to Ms. DeVine, and Salesforce's

3   claim in this case that "trust is one of the core values at Salesforce," Salesforce reneged on the

4   commitment made by Mr. Barrantes, and continued the course of conduct that prevented GEA

5   from conducting its business and caused GEA to suffer damages claimed in its counterclaim.

6          15.     Although it had allowed LeClair, Whelan, and LAMI to take action that resulted in

7   locking GEA out of its database and Salesforce account with no proof of ownership, Salesforce

8   applied a different standard to the requests by GEA that its access be restored, and applied that

9   standard in a manner it knew to be improper. Even after Mr. Barrantes' written acknowledgement

10  of the sufficiency of the proof of ownership provided by Ms. DeVine, Salesforce has falsely

11  insisted that GEA did not provide proof of ownership, and wrongly claimed a right to apply a

12  different standard to GEA than to LeClair, Whelan, and LAMI.

13         16.     When Ms. DeVine provided Salesforce with the evidence acknowledged by

14  Salesforce to be sufficient to establish GEA's ownership of the GEA database and GEA's

15  Salesforce account, Salesforce knew, and any reasonable person or company in Salesforce's

16  position would have known, that it had a duty to restore GEA's access to the GEA database and

17  GEA's Salesforce account. By failing to restore GEA's access despite its knowledge and

18  acknowledgement of GEA's ownership and right to access, and by the other conduct complained

19  of herein, Salesforce caused harm to GEA that GEA would not have suffered but for Salesforce's

20  improper refusal to restore GEA's access and the other matters complained of herein.

21         17.     By October 13, 2016, Salesforce was knowingly and actively assisting LeClair's

22  efforts to deny GEA's access to its database and Salesforce account. Earlier that day, per

23  LeClair's demand that he be informed of any outreach from GEA, Salesforce alerted LeClair of

24  Ms. DeVine's email. Salesforce had no duty to lend assistance to LeClair in this manner, but

25  Salesforce knowingly and intentionally decided that it would take sides against GEA, and assist

26  LeClair's efforts to prevent GEA from accessing its database. Salesforce did not disclose to GEA

27  that it was actively assisting LeClair's efforts.

28

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
NO. 4:19-CV-01710-JST

18.     The next day Salesforce Mr. Barrantes falsely informed GEA that LeClair provided "some documentation" supporting his claim to GEA's account. When he made that statement, Mr. Barrantes knew he had no basis to make it. Despite its earlier review of the license agreement and knowledge that GEA owned the GEA database and the GEA Salesforce account, Salesforce refused to restore GEA's access.

19.     Ms. DeVine asked Mr. Barrantes to forward whatever "documentation" LeClair provided, but Salesforce did not provide Ms. DeVine with any "documentation."

20.     On October 17, 2016, Ms. DeVine, exasperated by Salesforce's conduct, emailed Mr. Hotchkiss:

> I need the name of your manager. This is my work product. This is my database. I need to maintain control of my database and you are under no conditions allowed to transfer my intellectual property or my database to Jeremy LeClair or [his employee] or [Mr. LeClair's company] Luxury Auctions Marketing Inc. and I am copying my attorney on this email. Take this as formal legal notice and forward to your legal department and I want a case number on this matter and this escalated to the highest level and priority.

Mr. Hotchkiss provided Ms. DeVine the name of his manager.

21.     Later that day, Mr. Hotchkiss emailed LeClair to discuss LeClair's desire to open a new Salesforce account. LeClair planned to use the new account to house a complete copy of the GEA database Salesforce had previously acknowledge to be owned by GEA.

22.     On October 24, 2016, Salesforce opened a new account for LAMI and LeClair and assisted his efforts to clone the GEA database. Salesforce recommended a third-party vendor Mr. LeClair could use to copy and migrate GEA's database to the new account.

23.     On October 28, 2016, GEA's attorney wrote Salesforce's General Counsel, Amy Weaver, to repeat Ms. DeVine's statement that GEA owned the rights to its database. GEA's attorney provided Ms. Weaver with the LAMI License previously acknowledged by Salesforce to establish GEA's ownership of its database and Salesforce account.

24.     On November 7, 2016 with the cloning and migration of GEA's database underway, LeClair contacted Mr. Hotchkiss and asked him to cancel GEA's contract with

Salesforce. Within hours, and without requesting any verification of LeClair's right to do so, Salesforce executed the cancellation.

25.     On November 16, 2016, LeClair's former attorney, recanted in writing prior false statements he had made regarding the GEA database. He advised Salesforce unequivocally that LeClair never owned the GEA database.

26.     On November 20, 2016, Mr. Farkas emailed Salesforce and demanded that it lock down the newly LAMI created account opened by LeClair, and prevent LeClair's further use of GEA's proprietary information. Mr. Farkas's email included several attachments including: the November 16, 2016 letter from Mr. LeClair's former attorney, the LAMI License, the notice GEA sent to Mr. LeClair that terminated the LAMI License, and a court order denying LeClair's request for an injunction against GEA. The attachments provided further confirmation of GEA's rights. When Salesforce reviewed Mr. Farkas's email and attachment, its knowledge that GEA owned the GEA database and the GEA Salesforce account was confirmed. No reasonable person or company in the position of Salesforce that received Mr. Farkas's email and attachments could arrive at any conclusion other than that GEA owned the GEA database and the GEA Salesforce account, as Salesforce had previously acknowledged.

27.     On November 21, 2016, GEA's lawyer emailed Salesforce Senior Counsel Aseem Gupta, repeating the information provided by Mr. Farkas the previous day, and reiterating that "GEA was the exclusive owner of all intellectual property at issue."

28.     On November 29, 2016, the Mecklenburg County North Carolina Superior Court found that GEA's database was "exclusively owned by GEA, Inc." and granted a temporary restraining order preventing LeClair from accessing or using GEA's database. *See Luxury Actions Marketing, Inc. et al., v. GEA, Inc., et al.,* No. 16-CVS-19851 (N.C. Sup. Ct. November 22, 2016). The court's order included the following statement:

> "Jeremy LeClair [is] hereby restrained from the use . . . of any item of intellectual property that [he] acquired [via] a revocable, non-exclusive license by the terms of an Intellectual Property License Agreement, dated August 8, 2016, including but not limited to . . . a database organized and existing on software subscribed to by GEA as SalesForce® Account Number 4-565499."

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
NO. 4:19-CV-01710-JST

29.     GEA's attorney emailed the restraining order to Mr. Gupta the day it was issued. Salesforce has never contested the accuracy of the court's conclusion that the database was "exclusively owned by GEA, Inc.," and no court has ever reached a contrary conclusion.

30.     Although Salesforce alleges in its complaint that GEA never provided information sufficient to establish its ownership of the GEA database, on December 29, 2016, Salesforce restored GEA's access to its database, but Salesforce continued to allow LeClair to use the cloned version of GEA's database that Salesforce helped Mr. LeClair create.

31.     On January 16, 2017, Ms. DeVine emailed Mr. Gupta and another Salesforce employee to again state that Salesforce had allowed, and was continuing to allow, LeClair to directly compete with GEA using an illegally obtained copy of GEA's proprietary database. Mr. Gupta replied that day, by email. Mr. Gupta falsely stated: "I want to be clear that we did not change ownership or transfer anything to Mr. LeClair without authorization."

32.     Not until September 11, 2017, nearly a year after GEA provided Salesforce with notice and documentary evidence acknowledged by Salesforce to be sufficient that LeClair did not own, and had misappropriated, GEA's database, did Salesforce terminate LeClair's account. The termination was unrelated to GEA's repeated requests or the damage Salesforce caused. LeClair's account was terminated because he hadn't paid his Salesforce bills.

## FIRST COUNTERCLAIM
### (Misappropriation of Trade Secrets)

33.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 of its counterclaim.

34.     GEA's proprietary database, and the data contained therein, are trade secrets. The database tracks over 40 different data points related to past and future buyers, sellers, and business opportunities, including prospective buyer contact information, price points, and purchasing habits. The database was created for the purpose of recording the identities of, and listing contact information for, the limited group of individuals who are, or who control, the potential buyers and sellers who are essential to success in the luxury real estate auction business.

35.     The luxury real estate auction industry is a competitive industry. In 2016, there were only five companies operating nationally. As the North Carolina Court of Appeals recognized, "Ms. DeVine's companies were highly successful, in part due to . . . a large customer database that GEA and Ms. DeVine had assembled over the years." *GEA, Inc. v. Luxury Auctions Mktg.*, 817 S.E.2d 422, 426 (N.C. Ct. App. 2018).

36.     It is not practical to market a luxury real estate auction business successfully without targeting marketing to the limited group of individuals who are likely to sell or buy, or who control, sellers or buyers of luxury real estate at auction. The information needed to target marketing efficiently is not publicly available, and cannot be assembled without substantial expenditures of time and money. GEA has borne the cost, and made the effort, necessary to create a database that includes the identification of buyers and sellers, and other information that is important in marketing to them, including their buying and selling history, the prices they have paid or received, the locations in which they are interested, their auction bidding history, and their auction bidding approaches.

37.     The information in the GEA database is not publicly available, or available to GEA's competitors or others who can obtain economic value from using or disclosing the database, and is not generally known or readily ascertainable through independent development. It took GEA many years and substantial time, effort, and capital to build the database. The database and the information it contains have substantial economic value as a result of not being generally known or available. The information in the database provides a significant competitive benefit to GEA. The value of the GEA database is shown by LeClair's theft of the database, and his attempt to build a competing business around it.

38.     Given the value and importance of the database to GEA's business, GEA took reasonable steps to maintain the secrecy of the database and the information it contains. GEA restricted access to the database, and did not disclose the content of the database to anyone not under a duty to maintain its confidentiality.

39.     Salesforce misappropriated GEA's trade secrets by acquiring the GEA database for housing in accounts controlled by LeClair, using and disclosing the GEA database without

1   GEA's consent and with knowledge, or under circumstances that would cause a reasonable
2   person to know, that it belonged to GEA and could not be used or disclosed except as authorized
3   by GEA.

4       40.     As a direct and proximate result of Salesforce's misappropriation of GEA's trade
5   secrets, GEA has been damaged in an amount in excess of $75,000, exclusive of interest and
6   costs, that will be proved at trial.

7       41.     Salesforce's misappropriation of GEA's trade secrets was knowing, willful, and
8   malicious. Salesforce knew and acknowledged that GEA owned the database, and it admits in its
9   complaint in this case that LeClair, Whelan, and LAMI never provided proof of a competing
10  claim of ownership. Despite its knowledge that only GEA owned the database and had the right to
11  access the database, Salesforce misappropriated GEA's trade secrets to its benefit and the benefit
12  of LeClair and LAMI, and denied GEA access to the database.

**SECOND COUNTERCLAIM**
**(Conversion)**

15      42.     GEA realleges and incorporates by reference the allegations of paragraphs 1
16  through 32 of its counterclaim.

17      43.     GEA owns its proprietary database.

18      44.     Salesforce intentionally and substantially interfered with GEA's possession and
19  control of its proprietary database by itself exercising dominion and control over the database, by
20  improperly preventing GEA from accessing the database, and by refusing to restore GEA's access
21  to the database, all with knowledge that GEA owned the database and the Salesforce account
22  through which it was housed.

23      45.     GEA did not consent to Salesforce's actions. To the contrary, GEA made repeated
24  attempts to convince Salesforce to restore GEA's access to the database and to prevent
25  unauthorized access by LeClair and LAMI.

26      46.     As a direct and proximate result of Salesforce's conversion of the GEA database,
27  GEA was damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be
28  proved at trial.

GEA, Inc.'s Amended Answer
And Counterclaims
No. 4:19-cv-01710-JST

47.     GEA called Salesforce's conduct to the attention of Salesforce's General Counsel and other managing agents of Salesforce. Salesforce ratified the actions of all of the employees involved in the denial by Salesforce of GEA's access to its database. When advised of the conduct of its employees, Salesforce refused to take appropriate steps to reverse their actions, or to prevent the harm they caused. Salesforce further ratified the conduct of its employees by suing GEA in this case.

48.     Salesforce's conversion of the GEA database was carried out with malice and oppression toward GEA. Salesforce's conversion of the GEA database with knowledge that the database was owned by GEA was despicable and carried out with a willful and conscious disregard of GEA's rights. Salesforce's conversion of the GEA database subjected GEA to cruel and unjust hardship, in conscious disregard of GEA's rights.

## THIRD COUNTERCLAIM
### (Negligence)

49.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 of its counterclaim.

50.     Salesforce claims that "trust" is a core value at Salesforce, and GEA placed its trust in Salesforce securely to host the proprietary database and act appropriately when issues regarding the security of the database arose. Salesforce repeatedly breached that trust, failed to live up to its own standards for safeguarding the data of its customers, and grossly departed from the standards that would be followed by a company entrusted with the responsibility with protecting highly sensitive and valuable business information.

51.     Salesforce's conduct represented an extreme departure from what a reasonably careful company would do under similar circumstances. Despite the importance and value of the information entrusted to it, Salesforce did not follow consistent reasonable standards. Salesforce allowed its desire to obtain additional revenue through a relationship with LeClair and LAMI to affect its dealings with GEA.

52.     Salesforce replaced GEA's billing contact without taking any steps to verify the change with the previous contact. When advised that the replacement of Mr. Farkas was

improper, Salesforce doubled down, claiming falsely that it had a right to impose arbitrary limitations on GEA's rights. When it was provided with the license agreement between GEA and LAMI, Salesforce acknowledged that the information provided was sufficient to establish GEA's ownership of the GEA database and GEA's Salesforce account. Despite its admitted knowledge that GEA was the owner, Salesforce refused to do anything to correct its improper elimination of GEA's access to the database.

53.     Salesforce ignored the repeated protestations of Ms. DeVine, Mr. Farkas, and GEA's counsel, while it pursued new sales opportunities with LeClair and LAMI. When LeClair informed Salesforce that he wanted to open a new account to which he would transfer a copy of GEA's database, Salesforce rushed to make the sale. Salesforce even instructed LeClair on the procedures for copying and transferring GEA's database, and allowed LeClair to operate the copycat account until September 2017, when Salesforce closed the account because was no longer providing additional revenue to it.

54.     As a direct and proximate result of Salesforce's conduct, GEA was damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

### FOURTH COUNTERCLAIM
#### (Breach of Written Contract)

55.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 of its counterclaim.

56.     GEA and Salesforce entered into a written contract pursuant to which Salesforce agreed to provide customer relationship management software and services to GEA. Salesforce agreed that it would provide administrative, physical, and technical safeguards to protect the security, confidentiality and integrity of GEA's database.

57.     Salesforce materially breached the contract by improperly removing Leslie Farkas as the billing contact and depriving GEA of access to the account. Salesforce further breached the contract by refusing to restore access to GEA, and allowing the transfer of GEA's data to LeClair and LAMI.

58.     As a direct and proximate result of Salesforce's breach of the contract, GEA was damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

**FIFTH COUNTERCLAIM**
**(Intentional Interference With Contractual Relations)**

59.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 of its counterclaim.

60.     No later than October 13, 2016, Salesforce knew of the LAMI License. Salesforce had a copy of the LAMI License and knew, or should have known, of the terms of the license. A reasonable company in the position of Salesforce would have read the LAMI License and acted in a manner consistent with its terms. Despite GEA's repeated demands, Salesforce refused to recognize GEA's rights as shown by the LAMI License, and refused to restore GEA's access to its database and Salesforce account, and block LeClair's use of GEA's database and account.

61.     Under the LAMI License, LeClair and LAMI were required to cease use of the database, and to refrain from any action that would create the impression that the LAMI License remained in effect. Like Salesforce, they were required to restore GEA's access to the database. GEA called upon Salesforce to take the minimal steps that would have made it possible for the performance required under the LAMI License to be carried in an efficient and less costly manner, but Salesforce refused to do so. Salesforce knowingly and intentionally refused to take the actions it knew were required to achieve the performance due under the LAMI License and to prevent additional loss associated with non-performance.

62.     Salesforce's actions made performance under the LAMI License far more difficult and expensive than it would have been had Salesforce complied with GEA's demands for access to the database. Among other things, GEA was forced to seek what it should have received through Salesforce in litigation, at significant and unnecessary cost.

63.     As a direct and proximate result of Salesforce's interference with the LAMI License, GEA was damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

64.     GEA called Salesforce's conduct to the attention of Salesforce's General Counsel and other managing agents of Salesforce. Salesforce ratified the actions of all of the employees involved in the denial by Salesforce of GEA's access to its database. When advised of the conduct of its employees, Salesforce refused to take appropriate steps to reverse their actions, or to prevent the harm they caused. Salesforce further ratified the conduct of its employees by suing GEA in this case.

65.     Salesforce's interference with the LAMI License was carried out with malice and oppression toward GEA. Salesforce's interference, undertaken with knowledge that the database was owned by GEA, was despicable and carried out with a willful and conscious disregard of GEA's rights. Salesforce's interference subjected GEA to cruel and unjust hardship, in conscious disregard of GEA's rights.

<b>SIXTH COUNTERCLAIM</b><br>(<b>Intentional Interference With Prospective Economic Advantage</b>)

66.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 of its counterclaim.

67.     GEA had economic relationships that likely would have resulted in economic benefits to GEA but for Salesforce's conduct. Salesforce knew, and a reasonable person or company in the position of Salesforce would have known, of these relationships as a result of GEA's communications about the harm Salesforce's actions were causing.

68.     Salesforce knew, and a reasonable person or company in the position of Salesforce would have known, that disruption of GEA's relationships was substantially certain to occur if GEA's access to its database was not restored. Without access to its database, GEA was not able to realize the economic benefits it would have realized had access been restored.

69.     As a direct and proximate result of Salesforce's interference, GEA was damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

70.     GEA called Salesforce's conduct to the attention of Salesforce's General Counsel and other managing agents of Salesforce. Salesforce ratified the actions of all of the employees involved in the denial by Salesforce of GEA's access to its database. When advised of the

conduct of its employees, Salesforce refused to take appropriate steps to reverse their actions, or to prevent the harm they caused. Salesforce further ratified the conduct of its employees by suing GEA in this case.

71.     Salesforce's interference was carried out with malice and oppression toward GEA. Salesforce's interference, undertaken with knowledge that the database was owned by GEA, was despicable and carried out with a willful and conscious disregard of GEA's rights. Salesforce's interference subjected GEA to cruel and unjust hardship, in conscious disregard of GEA's rights.

## SEVENTH COUNTERCLAIM
### (Conspiracy and Aiding and Abetting (Conversion))

72.     GEA realleges and incorporates by reference the allegations of paragraphs 1 through 32 and 42 through 48 of its counterclaim.

73.     GEA owns its proprietary database.

74.     LeClair and LAMI intentionally and substantially interfered with GEA's possession and control of its proprietary database by exercising dominion and control over the database, by improperly preventing GEA from accessing the database, and by refusing to restore GEA's access to the database, all with knowledge that GEA owned the database and the Salesforce account through which it was housed.

75.     GEA did not consent to LeClair's and LAMI's actions.

76.     Salesforce knew of the conversion of the GEA database by LeClair and LAMI. Salesforce was told of the conversion by GEA, and Salesforce acknowledge that the proof provided by GEA established GEA's ownership of the database. Salesforce and LeClair and LAMI nonetheless agreed to cooperate in carrying out LeClair's and LAMI's conversion of the GEA database, and Salesforce actively and substantially assisted LeClair and LAMI. Salesforce agreed to advise LeClair of attempts by GEA to enforce its rights, and it carried out that agreement. Salesforce agreed with LeClair and LAMI on the establishment of a new account through which LeClair and LAMI would carry out their conversion of the database. Salesforce assisted LeClair and LAMI in setting up and implementing the new account, including by helping them clone the database and transfer the database from the GEA account to the new account

1   established by LeClair and LAMI.

2       77.   As a direct and proximate result of LeClair's and LAMI's conversion of the GEA

3   database and Salesforce's assistance of and participation therein, GEA was damaged in an

4   amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

5   Independent of its direct liability for its conduct, Salesforce is vicariously liable for the

6   conversion by LeClair and LAMI it assisted.

7       78.   GEA called Salesforce's conduct to the attention of Salesforce's General Counsel

8   and other managing agents of Salesforce. Salesforce ratified the actions of all of the employees

9   involved in the denial by Salesforce of GEA's access to its database, and their assistance and

10  participation in the actions of LeClair and LAMI. When advised of the conduct of its employees,

11  Salesforce refused to take appropriate steps to reverse their actions, or to prevent the harm they

12  caused. Salesforce further ratified the conduct of its employees by suing GEA in this case.

13      79.   Salesforce's assistance of and participation in LeClair's and LAMI's conversion of

14  the GEA database was carried out with malice and oppression toward GEA. Salesforce's actions,

15  taken with knowledge that the database was owned by GEA, were despicable and carried out with

16  a willful and conscious disregard of GEA's rights. Salesforce's actions subjected GEA to cruel

17  and unjust hardship, in conscious disregard of GEA's rights.

18  **EIGHTH COUNTERCLAIM**

19  **(Conspiracy and Aiding and Abetting (Misappropriation of Trade Secrets))**

20      80.   GEA realleges and incorporates by reference the allegations of paragraphs 1

21  through 32 and 33 through 41 of its counterclaim.

22      81.   GEA's proprietary database, and the data contained therein, are trade secrets. The

23  database tracks over 40 different data points related to past and future buyers, sellers, and

24  business opportunities including prospective buyer contact information, price points, and

25  purchasing habits. The database was created for the purpose of recording the identities of, and

26  listing contact information for, the limited group of individuals who are, or who control, the

27  potential buyers and sellers who are essential to success in the luxury real estate auction business.

28

82.     The luxury real estate auction industry is a competitive industry. In 2016, there were only five companies operating nationally. As the North Carolina Court of Appeals recognized, "Ms. DeVine's companies were highly successful, in part due to . . . a large customer database that GEA and Ms. DeVine had assembled over the years." *GEA, Inc. v. Luxury Auctions Mktg.*, 817 S.E.2d 422, 426 (N.C. Ct. App. 2018).

83.     It is not practical to market a luxury real estate auction business successfully without targeting marketing to the limited group of individuals who are likely to sell or buy, or who control, sellers or buyers of luxury real estate at auction. The information needed to target marketing efficiently is not publicly available, and cannot be assembled without substantial expenditures of time and money. GEA has borne the cost, and made the effort, necessary to create a database that includes the identification of buyers and sellers, and other information that is important in marketing to them, including their buying and selling history, the prices they have paid or received, the locations in which they are interested, their auction bidding history, and their auction bidding approaches.

84.     The information in the GEA database is not publicly available, or available to GEA's competitors or others who can obtain economic value from using or disclosing the database, and is not generally known or readily ascertainable through independent development. It took GEA many years and substantial time, effort, and capital to build the database. The database and the information it contains have substantial economic value as a result of not being generally known or available. The information in the database provides a significant competitive benefit to GEA. The value of the GEA database is shown by LeClair's theft of the database, and his attempt to build a competing business around it.

85.     Given the value and importance of the database to GEA's business, GEA took reasonable steps to maintain the secrecy of the database and the information it contains. GEA restricted access to the database, and did not disclose the content of the database to anyone not under a duty to maintain its confidentiality.

86.     LeClair and LAMI misappropriated GEA's trade secrets by using and disclosing the GEA database without GEA's consent and with knowledge that it belonged to GEA and could

1    not be used or disclosed except as authorized by GEA.

2         87.    Salesforce and LeClair and LAMI nonetheless agreed to cooperate in carrying out

3    LeClair's and LAMI's misappropriation of GEA's trade secrets, and Salesforce actively and

4    substantially assisted LeClair and LAMI. Salesforce agreed to advise LeClair of attempts by GEA

5    to enforce its rights, and it carried out that agreement. Salesforce agreed with LeClair and LAMI

6    on the establishment of a new account through which LeClair and LAMI would carry out their

7    misappropriation of GEA's trade secrets through use and disclosure of the database. Salesforce

8    assisted LeClair and LAMI in setting up and implementing the new account, including by helping

9    them clone the database and transfer the database from the GEA account to the new account

10   established by LeClair and LAMI.

11        88.    As a direct and proximate result of LeClair's and LAMI's misappropriation of

12   GEA's trade secrets and Salesforce's assistance of and participation therein, GEA has been

13   damaged in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at

14   trial.

15        89.    LeClair's and LAMI's misappropriation of GEA's trade secrets was knowing,

16   willful, and malicious. Salesforce knew and acknowledged that GEA owned the database, and it

17   admits in its complaint in this case that LeClair, Whelan, and LAMI never provided proof of a

18   competing claim of ownership. Despite its knowledge that only GEA owned the database and had

19   the right to access the database, Salesforce provided substantial assistance to and participated in

20   LeClair's and LAMI's misappropriation of GEA's trade secrets to its benefit and the benefit of

21   LeClair and LAMI, and denied GEA access to the GEA database.

22                              **NINTH COUNTERCLAIM**

23                 **(North Carolina Unfair and Deceptive Trade Practices Act)**

24        90.    GEA realleges and incorporates by reference the allegations of paragraphs 1

25   through 89 of its counterclaim.

26        91.    GEA contacted Salesforce immediately after it realized LeClair had locked Ms.

27   DeVine and Mr. Farkas out of the GEA account. GEA presented Salesforce with information

28   demonstrating that LeClair, Whelan, and LAMI did not own the GEA database or the GEA

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
NO. 4:19-CV-01710-JST

1    Salesforce account, and Salesforce acknowledged in writing that the information provided by

2    GEA was sufficient. Despite its knowledge that LeClair, Whelan, and LAMI did not own the

3    GEA database or the GEA Salesforce account, and although Salesforce was aware of facts that

4    would have led a reasonable person or entity in the position of Salesforce to know that LeClair,

5    Whelan, and LAMI did not own the GEA database or the GEA Salesforce account, GEA did not

6    take appropriate action to restore GEA's access, or to enable GEA itself to take action to

7    overcome what LeClair had done.

8          92.     Salesforce claimed that its refusal to take appropriate action was based on an

9    unwritten Salesforce policy that was not recorded in a contract between GEA and Salesforce, is

10   not recorded in a manner that could be verified by GEA, and had not been disclosed to GEA.

11   Salesforce claimed that it followed a policy pursuant to which it will not disturb a system

12   administrator's powers. Salesforce claimed that it follows this policy even when it is given notice

13   that a system administrator is engaging in criminal or otherwise unlawful conduct. According to

14   the policy claimed by Salesforce, no matter the circumstances, Salesforce will only intervene if it

15   is provided "a court order or other proof of final adjudication" regarding ownership of a given

16   account.

17         93.     Salesforce's claim that it follows such a policy is false. No reasonable company

18   would establish a policy that provides the type of support for criminal conduct provided by the

19   policy claimed by Salesforce, or that would produce the severe harm to users that would be

20   caused by the policy claimed by Salesforce without a reasonable justification. In its complaint in

21   this case, Salesforce asserts that GEA never provided it with sufficient proof of its ownership of

22   the GEA database and the GEA Salesforce account. Despite this assertion, Salesforce restored

23   GEA's access to the GEA database on December 29, 2016, contrary to its claim that it follows a

24   policy precluding restoration of access under these circumstances.

25         94.     The false assertion by Salesforce that it follows a policy precluding restoration of

26   access to the rightful owner of an account and the information associated with the account is

27   unfair and deceptive. Salesforce is able falsely to claim such a policy because of the power it

28   holds over GEA and other customers. Salesforce had possession of GEA's database, the lifeblood

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
NO. 4:19-CV-01710-JST

1    of GEA, and the ability to control access to the database. When faced with LeClair's conduct,

2    GEA was dependent on proper action by Salesforce to restore its access to its database. The

3    exercise of Salesforce's power through a false assertion of an unnecessary and unreasonable

4    policy caused harm to GEA that could have been avoided without any harm to Salesforce or to

5    Salesforce's legitimate interests.

6           95.    The assertion of a policy Salesforce does not actually follow has a tendency to

7    deceive GEA and others in its position. Because the purported policy announced by Salesforce is

8    not a part of a contract between GEA and Salesforce, and because the purported policy is not

9    recorded in a manner that could be verified by GEA, GEA lacked the means to confirm the

10   existence of the policy. As a direct and proximate result of Salesforce's reliance on a false claim

11   of a policy precluding restoration of GEA's access to the database, GEA was denied access to the

12   database and denied the right to control its Salesforce account. Rather than provide information

13   sufficient to establish GEA's rights in the eyes of a reasonable person or entity in the position of

14   Salesforce, and acknowledged by Salesforce to have been sufficient, GEA had no alternative to

15   the pursuit of legal and other actions in an attempt to restore its access. Salesforce knew,

16   however, and any reasonable person or entity in the position of Salesforce would have known,

17   that the actions available to GEA could not reasonably be expected to produce the information

18   claimed by Salesforce in its complaint to be required within a time frame that would avoid severe

19   harm to GEA.

20          96.    The policy claimed by Salesforce would be unfair and deceptive even if it had

21   been a part of a contract between GEA and Salesforce, recorded in a manner that could be

22   verified by GEA, or disclosed to GEA. But Salesforce's alleged policy is not found in the MSA or

23   any other contract documentation GEA could have reviewed before it executed its contract with

24   Salesforce. GEA learned of Salesforce's claim of a policy for the first time when, in response to

25   Ms. DeVine's urgent request that her access be restored, Mr. Hotchkiss explained that

26   "unfortunately, there is nothing we can do here. Salesforce cannot log into accounts and make

27   changes to user licenses. Only a user of the Salesforce account has control over who has system

28   administrator rights and to whom subscriptions are provisioned and with what permission levels."

1   Mr. Hotchkiss's manager, Mr. Hazelton, later reiterated that it was Salesforce's policy that "[i]f

2   your license has been deactivated by your system admin unfortunately there is nothing we can do.

3   I would recommend working with your legal team and your admin to arrange proper licensing."

4   Salesforce's purported "see no evil" policy is extremely detrimental and injurious to victims like

5   GEA, unreasonable, and unjustified by any legitimate interests of Salesforce.

6          97.     A reasonable Salesforce user in the position of GEA would expect that the material

7   terms of the relationship between Salesforce and its users were disclosed. GEA did not expect,

8   and a reasonable user in its position would not expect, the relationship between Salesforce and its

9   users to be governed by extra contractual policies that were not recorded in a manner that could

10  be verified, were not disclosed, and were not consistent with GEA's expectations and the

11  expectations of a reasonable person in GEA's position. GEA did not expect, and a reasonable user

12  in the position of GEA would not expect, that it had no reasonable, actionable recourse following

13  the theft of its data if an administrator is the thief. GEA did not expect, and a reasonable user in

14  the position of GEA would not expect, that it would be required to present "a court order or other

15  proof of final adjudication" to avoid the loss of its data. A requirement of "a court order or other

16  proof of final adjudication" was not a part of a contract between GEA and Salesforce, was not

17  recorded in a manner that could be verified by GEA, and was not properly disclosed to GEA.

18         98.     Since filing this lawsuit, Salesforce has falsely claimed that "[a]t no time did GEA

19  provide Salesforce with a court order or other proof of final adjudication of GEA's and LeClair's

20  dispute over ownership of the Account. Absent such proof, Salesforce could not—and was not

21  obligated by the Agreement to—modify administrator privileges of any user of the Account.

22  Salesforce therefore has not directly or indirectly breached the Agreement." Complaint ¶ 25.

23  There is no contractual basis for Salesforce's claim that its conduct must be judged by the

24  standard alleged by Salesforce in its complaint, and no basis on which GEA might verify the

25  existence of a basis for Salesforce's claim that its conduct must be judged by that standard, and

26  Salesforce did not disclose that it would claim that its conduct could be judged only by an

27  unreasonable and unjustified standard of this nature. Reliance on an extra contractual, unrecorded,

28  and undisclosed standard of this nature is unfair and deceptive.

99.     Salesforce's stated policy of depriving its customers of any reasonable recourse when they are victims of unlawful conduct is inconsistent with any reasonable concept of legal or moral right or wrong, unethical, oppressive, unscrupulous, and substantially injurious to all consumers, including GEA. The inappropriateness of Salesforce's stated policy is evidenced by its extreme departure from Salesforce's claim that "[t]rust is one of the core values at Salesforce, where nothing is more important than the trusted relationship between Salesforce and its customers, employees, partners, and everyone in the Salesforce family."

100.     Salesforce's stated policy is also inconsistent with any reasonable concept of legal or moral right or wrong, unethical, oppressive, unscrupulous, and substantially injurious to all consumers, including GEA, because it places the burden of addressing misconduct that occurs on the Salesforce platform entirely on Salesforce users and the courts, and it does so in a manner that is not reasonably or sensibly calculated to provide for timely or adequate solutions for objectively provable harm.

101.     Salesforce demonstrated the unreasonableness and inappropriateness of its purported policy by restoring GEA's access, despite its claim that GEA did not provide the "proof" required by the policy.

102.     Salesforce's failure to disclose its purported policy to GEA would be a deceptive practice if the purported policy were an actual policy. Salesforce could easily have notified GEA of any such policy in a contract, or otherwise have done so before GEA opened its account. GEA did not expect, and a reasonable user in its position would not expect, that a company in the position of Salesforce would adopt or apply an oppressive and unreasonable policy of the type Salesforce claimed when GEA asked that access to its database and its Salesforce account be restored. GEA had no way to know that a company that bills itself as "the leading enterprise cloud computing company," Complaint ¶ 19, and which claims that "[t]rust is one of the core values at Salesforce, where nothing is more important than the trusted relationship between Salesforce and its customers, employees, partners, and everyone in the Salesforce family," Complaint ¶ 10, would have a policy whereby the most urgent needs of its customers would be treated with indifference. Only a company as dominant as Salesforce, and with the level of

1    control Salesforce had over GEA's most important information would have the power to

2    implement such a policy and think it could get way with it.

3        103.    As a direct and proximate result of Salesforce's conduct, GEA has been damaged

4    in an amount in excess of $75,000, exclusive of interest and costs, that will be proved at trial.

5                                  **PRAYER FOR RELIEF**

6        WHEREFORE, GEA prays for judgment as follows:

7        1.    That Salesforce take nothing by its complaint, and the declarations it requests be

8    denied;

9        2.    For compensatory damages in an amount according to proof, and in excess of

10    $75,000, exclusive of interest and costs;

11        3.    For enhanced damages for trade secret misappropriation and Salesforce's

12    participation in the trade secret misappropriation by LeClair and LAMI;

13        4.    For treble damages for Salesforce's violation of the North Carolina Unfair and

14    Deceptive Trade Practices Act;

15        5.    For exemplary damages in an amount sufficient to punish Salesforce for the

16    conduct complained of herein and to deter further similar conduct;

17        6.    For costs of suit and reasonable attorneys' fees incurred herein;

18        7.    For pre- and post-judgment interest;

19        8.    For such other relief as the Court deems proper.

20

21    Dated:  June 29, 2020                          ROBERT E. FREITAS
                                                     JOSHUA L. YOUNG
22                                                   FREITAS & WEINBERG LLP

23

24                                                   */s/ Robert E. Freitas*
                                              _____
25                                                   Robert E. Freitas
                                                     Attorney for Defendant
26                                                   GEA, Inc.

27

28

GEA, INC.'S AMENDED ANSWER
AND COUNTERCLAIMS
No. 4:19-CV-01710-JST

-24-

1

## **DEMAND FOR JURY TRIAL**

2

GEA demands a trial by jury for all issues so triable.

3

4   Dated:  June 29, 2020                                              ROBERT E. FREITAS
                                                                            JOSHUA L. YOUNG
5                                                                       FREITAS & WEINBERG LLP

6

7                                                                       */s/ Robert E. Freitas*
                                                                        ———————————————
8                                                                       Robert E. Freitas
                                                                        Attorney for Defendant
9                                                                       GEA, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28